## (C. D. 1374)

### THE UNIVERSITY OF CHICAGO *v.* UNITED STATES

United States Customs Court, Second Division

(Decided November 28, 1951)

*Guy Martin* (*Peter J. Brennan* of counsel) for the plaintiff.

*Charles J. Wagner,* Acting Assistant Attorney General (*Guy G. Ribaudo* and *Richard H. Welsh,* special attorneys), for the defendant.

Before LAWRENCE, RAO, and FORD, Judges.

RAO, Judge: An importation from England of 50 copies of a book entitled "A Reverse Index of Greek Nouns and Adjectives," hereinafter called "Reverse Index," was classified by the collector of customs at the port of Chicago as books of other than *bona fide* foreign authorship, pursuant to the provisions of paragraph 1410 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T. D. 51802. Duty was accordingly assessed thereon at the rate of 10 per centum ad valorem. Plaintiff has protested said classification and assessment, claiming that by virtue of paragraph 1630 of the Tariff Act of 1930, the books are free of duty as being wholly or chiefly in languages other than English.

The pertinent tariff provisions read as follows:

Paragraph 1410 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, *supra*:

| Tariff Act of 1930, paragraph | Description of products | Rate of duty |
|---|---|---|
| 1410___ | Unbound books of all kinds, bound books of all kinds except those bound wholly or in part in leather, * * *. <br> * * * * * * * <br> If of other than bona fide foreign authorship: <br> * * * * * * * <br> Other books (except diaries), sheets or printed pages of books bound wholly or in part in leather, pamphlets, and music in books or sheets. | 10% ad val. |

Paragraph 1630 of the Tariff Act of 1930, insofar as here applicable:

PAR. 1630. Books and pamphlets printed wholly or chiefly in languages other than English; * * *.

It appears from the record before us, and the sample of the importation which is in evidence as plaintiff's exhibit 1, that the "Reverse Index" is a highly professional source book of Greek nouns and adjectives designed to assist the advanced scholar in Greek papyrology, epigraphy, and textual criticism. By its use, the philologist obtains a history of nouns and adjectives in Greek, and because the words are listed in reverse, that is, according to suffixes and endings, it aids the epigraphist in his reading and studying of ancient manuscripts and inscriptions.

The book itself contains some 765 pages of text material plus 17 pages devoted to titles, preface, explanations, abbreviations, and table of contents. Of the text material, there are approximately 134 pages which contain, in whole or in part, chapter introductions, some of the authors' opinions about the various etymologies, their explanations of how the roots and suffixes of the words develop, and how they intend to compose the list. To a great extent, English is the language which predominates in the aforementioned pages, although throughout, there are interpolations of Greek words, and endings.

The remaining 631 pages consist of some 600 pages of the so-called word lists and approximately 20 pages designated as corrections and additions. Concerning the language in which this portion of the book was printed, plaintiff offered the testimony of two professors at Johns Hopkins University. The first of these was Dr. Henry Rowell, professor of Latin and chairman of the University's Classics Department. He stated that he made a study of the "Reverse Index" and found that of the 745 pages between the preface and the corrections and additions, 604 are entirely in Greek and Latin with the exception of a few English words used in the headings, and a very occasional reference to a modern document by its title in a modern language. Taking page 155 of the book as an example, Dr. Rowell pointed out that it contains a heading in which there are five English words, and three columns of Greek words, at the side of each of which is a reference to an author or document in which the word is attested. As to these references, with few exceptions, they are given in their Latin form.

Dr. Rowell testified further that in compiling the data for his testimony he intentionally omitted to count any pages containing more English than that which appears in the headings, even though on many of the pages thus ignored, the Greek and Latin far outbalanced the English; that the book as a whole would be useless to anyone who was not a Greek scholar; that the English portions of the books are no more than brief introductions written to orientate and guide the

reader in his use and study of its main parts, which consist of the Greek word lists and the places, given in Latin abbreviations, where the words can be found attested; that the book is distinctly not a dictionary as no meaning of any Greek word either in English or in any other modern language is given; and that in his opinion more than three-quarters of all the pages in these books are printed 90 per centum in Greek and Latin.

On cross-examination, Dr. Rowell explained that the references next to the Greek words listed in columns on the 604 pages in question were in the Latin forms of the Latin words; as, for example, on page 223, the fifth abbreviation in the last column reads "Anth. P." which is the abbreviation for Anthology (more probably Anthologia) Palatina, a Latin form; that the English form would be Palatine Anthology; and that nearly all the abbreviations follow those found in Leidell & Scott, a standard large Greek dictionary.

Professor James Henry Oliver, formerly a staff epigraphist on the staff of American Excavations in the Athenian Agora, and presently professor of Greek at Johns Hopkins University, was the second witness called by the plaintiff. His testimony coincides largely with that of Dr. Rowell. It was Dr. Oliver's opinion with reference to the 604 pages in question that the word lists were printed chiefly in Greek and the references predominantly in Latin; that the book would be of no use to anyone other than a scholar of the Greek and Latin languages; that a scholar knowing Greek and Latin, but no English—if there were such person—would experience no difficulty in using the book "because the words are given in Greek and the words of reference in the usual Latin"; and that the basic thought in the book is Greek.

Based upon this record, counsel for the plaintiff contends that the "Reverse Index" is a book "printed wholly or chiefly in languages other than English" because a majority of the words contained in the book are printed in Greek and Latin, and not English, citing *United States* v. *Petry Co.*, *Petry Co.* v. *United States*, 11 Ct. Cust. Appls. 240, T. D. 39019; *United States* v. *Furuya*, 15 Ct. Cust. Appls. 331, T. D. 42492; *United States* v. *Nelson & Sons*, id. 268, T. D. 42465; the predominance of thought of the "Reverse Index" is in a language other than English, namely, Greek; the book is useful only to a person knowing Greek and would be useful to such a person even if he knew no English; and the evidence clearly establishes that the book is printed chiefly in languages other than English.

Counsel for the Government counters with the proposition that the evidence establishes that the books in question are printed chiefly in the English language; that the opinions of the witnesses are not binding on the court; that the sample is a potent witness; and that a consideration of the sample reveals that a majority of the names

indicated by the abbreviations are written as they appear in English textbooks, dictionaries, and other authorities, and as such have been accepted into the English vocabulary. Counsel for the Government also relies upon the *Petry* and *Nelson* cases, *supra.*

In *United States* v. *Petry Co., etc., supra,* the court had before it for consideration certain books which were composed of both an English and a foreign text, the one being a literal translation of the other. Where the original story was printed in English, a translation thereof into French, Spanish, or some other foreign language was given. Where the original story was in a foreign language, the English translation was always used. The books were so arranged that one page carried the English version, the next the foreign version, and insofar as possible, the mutual translations were printed in parallel lines on opposite sides of the pages of each book. The name of the work, a brief description of the books' contents, and various advertisements appearing on the outside pages of the volumes were exclusively in English, except that the titles of some of the foreign stories were carried in their original language. The court, after first holding that the books in issue were not textbooks within the meaning of that term, as it appeared in paragraph 426 of the Tariff Act of 1913, then proceeded to examine into the question of whether or not they were printed chiefly in languages other than English. It was the court's view that the volumes were so equally divided between the English and the foreign text that they could not fairly be said to be printed chiefly in either. Moreover, it was held that if the English print upon the coverings of the volumes be taken into consideration, it would tend to make the English portion thereof predominate. Accordingly, the books were held not to have been printed chiefly in languages other than English.

In a concurring opinion, Smith, J., after reviewing the tariff and legislative history of the provision for books printed chiefly in languages other than English in paragraph 426 of the Tariff Act of 1913, held that the language in question "means books whose chief worth or value to the reader is the foreign-language component thereof; that is to say, books of which the foreign language is the main, principal, and important part, and to which books the English language used is incidental, or subsidiary or merely explanatory of words or portions of the foreign text."

The views of Judge Smith were expressly repudiated in the case of *United States* v. *Nelson & Sons, supra,* where the court, in determining the classification of certain bilingual dictionaries, held as follows:

> It is argued that we should adopt the theory expressed in the concurring opinion in the *Petry* case and that if we should do so it would be found that the chief worth or value of the books in question is the foreign language component thereof.

It will be observed that paragraph 1529, under which free entry is claimed, designates "Books or pamphlets *printed* wholly or chiefly in languages other than English." Unless we are to disregard the plain meaning of this language, the question in each case must be not what the books are to be used for, or how useful they may be, but how they are *printed*. The Congress has made this the test and we are not at liberty to substitute some other. If they are *printed* wholly or chiefly in languages other than English, they are free; if not, they are dutiable. This does not mean that in case of bilingual books, where words, sentences, stories, or other literary productions are printed in two languages, the exact number of letters or words used to express the same thought must be counted to ascertain whether the book be chiefly printed in one or the other language. If the same thought be expressed by ten words in one language and by six in another, nevertheless, the language must, for the purposes of this act, be held to be the same and to predominate in favor of neither. [Italics quoted.]

We have adverted to the foregoing cases, both of which are leading authorities upon the interpretation of the phrase in prior tariff acts dealing with books printed wholly or chiefly in languages other than English, because both sides have relied upon them in their respective briefs. However, we are of opinion that neither of these cases is decisive of the issue we are here called upon to determine. This is true for the reason that it cannot seriously be disputed that if the language in the columns opposite those printed in Greek is English, the English portion of the books before us clearly predominates. On the other hand, if the abbreviations in question are, as testified by the witnesses for the plaintiff, largely in Latin, the books are without doubt printed chiefly in languages other than English. Whether we consider the number of words used, the thought expressed by those words, or the worth or value of the book to the reader, the great bulk of the work is covered by the 604 pages containing the Greek word list, and the references, the language of which is contested. Hence, if that language is not English, neither are the books.

Nor do we believe that the sample in this case is so potent a witness as to require us to disregard, as contrary, the testimonial evidence of record. An examination of plaintiff's exhibit 1 for the purpose of ascertaining the language in which the disputed columns are written or printed affords no ready answer for the uninitiate. Those columns consist for the most part of, as heretofore noted, abbreviations such as, and we select at random, "Heliod. Medl, Eccl.," "adj. Philo Byz.," "Hdt.," "Hom., Eur.+; adj. (?) Hesych.," "Schol. Soph.," "Schol. Aesch.," "Aesch. (conj.)," "Eust.," "Hipp.," and "Soph. +." We are not prepared to say that a mere reading of those abbreviations suffices to demonstrate in what language they are written. Accordingly, we deem it necessary and proper to consider the opinions of the expert witnesses called on behalf of the plaintiff. Their testimony that the great majority of the references—99 per centum thereof—are Latin abbreviations of Latin forms for the names of authors, and

titles of various works, stands uncontroverted and unrefuted. Without proof to the contrary, it establishes that the major portion of all the printed material in the volumes at bar is in languages other than English.

That testimony likewise disposes of the argument of the defendant to the effect that a majority of the names indicated by the abbreviations are written as they appear in English textbooks, dictionaries, and other authorities and as such have been accepted into the English vocabulary. Obviously, if the abbreviations are for Latin names and titles, in their Latin forms, they are not English, even though in the course of speaking or writing English it may be necessary to refer to those words in the original Latin form.

We think the evidence of record establishes without question that the "Reverse Index" is a book printed chiefly in languages other than English, within the purview of paragraph 1630 of the Tariff Act of 1930. The protest is, therefore, sustained.

Judgment will be entered accordingly.